IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| JOHN WALTON, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Civ. A. No. 21-860 |
| | ) | Judge Nora Barry Fischer |
| | ) | |
| WESTMORELAND COUNTY, et al. | ) | |
| | ) | |
| | ) | |
| Defendants. | ) | |

**<u>MEMORANDUM OPINION</u>**

I.      INTRODUCTION

In this civil rights and employment action, Plaintiff John Walton ("Walton" or "Plaintiff"), alleges that Defendants Commissioner Gina Cerilli Thrasher ("Cerilli") and Westmoreland County (the "County"), discriminated against him based on his gender and political affiliation.  (Docket No. 20).   Presently before the Court is a contested motion for summary judgment filed by Defendants which has been fully briefed and was argued at a motion hearing held on June 29, 2023.  (Docket No. 57-60; 66-68; 72-74; 76-77; 82).  The Court has since received and reviewed the official transcript of the proceeding, post-hearing supplemental briefs filed by the parties and issued a ruling on objections to the admissibility of certain evidence as to the pending motion. (Docket Nos. 84-87). After careful consideration of the parties' arguments and the evidence presented in light of the standards governing motions for summary judgment, and for the following reasons, Defendants' motion [57] is granted.

II.     FACTUAL BACKGROUND

    *A. The Parties*

Walton served as the Warden of the Westmoreland County Prison from June 2, 2003 until November 6, 2020. (Docket Nos. 59 at ¶¶ 1-2; 67 at ¶¶ 1-2). The Warden is not an elected official in Westmoreland County; rather, the position is held by an employee whose work is overseen by the six-person Westmoreland County Prison Board (the "Prison Board") that makes decisions affecting jail operations including, the hiring and firing of employees. (Docket Nos. 59 at ¶¶ 4, 6; 67 at ¶¶ 4, 6). The Warden's salary is determined by the four-person Westmoreland County Salary Board (the "Salary Board") that makes decisions on the salaries of employees in many different departments of the County. (Docket No. 86 at 66). The Warden's job includes serving as the ultimate supervisor of the County prison employees, as well as interviewing candidates and providing recommendations to the Prison Board regarding the hiring and promotions of jail staff. (Docket Nos. 59 at ¶¶ 15, 72; 67 at ¶¶ 15, 72). Walton was seen by many as a good Warden, and he helped the prison win awards and pass state testing with "flying colors." (Docket No. 68-3 at 18). Although Walton is a registered Democrat, it is undisputed that the Warden position did not require any particular political affiliation or patronage. (Docket Nos. 20 at ¶ 7; 29 at ¶ 7; 59 at ¶ 103; 67 at ¶ 103).

The County has three Commissioners who are elected officials and whose responsibilities include serving on the Prison and Salary Boards. (Docket Nos. 68-2 at 4; 68-3 at 45; 68-4 at 10). County Commissioners serve four-year terms; elections for these positions were held in 2015 and 2019. (*See* Docket Nos. 67 at ¶ 225; 73 at ¶ 225; 68-15 at 57). In 2015, Democratic candidate Cerilli won the election and took office as one of the County Commissioners on January 1, 2016.[1]

---

[1]     Cerilli's father, Greg Cerilli, previously served as a County Commissioner. (*See* Docket Nos. 68-16 at 47; 68-1 at 23).

(Docket Nos. 59 at ¶¶ 3, 103; 67 at ¶¶ 3, 103)).  Walton helped Cerilli with her campaign to become a Commissioner in 2015.  (Docket Nos. 59 at ¶ 26; 67 at ¶ 26).  Cerilli successfully campaigned for reelection in 2019 and was set to serve through 2023, but she recently resigned to take a role as an administrative law judge in the Workers' Compensation Bureau.  (Docket No. 86 at 3).  During her time in office, Cerilli served on both the Prison and Salary Boards and was appointed by the Prison Board to serve as its President.  (Docket Nos. 59 at ¶ 4; 67 at ¶ 4; 86 at 6).

### B.  The Prison and Salary Boards from 2016 to the Present

The Prison Board is comprised of six elected officials: the three County Commissioners, the Sheriff, the District Attorney, and the County Controller.  (Docket No. 68-2 at 4). The Prison Board meets twelve times per year and holds monthly public meetings on various matters related to jail operations.  (Docket No. 68-2 at 9).  Each member holds one vote and each decision of the Prison Board is made pursuant to a majority vote.  (Docket Nos. 59 at ¶¶ 4, 6; 67 at ¶¶ 4, 6).  With that said, the procedural rules of the Prison Board indicate that a member must make a motion on a pending matter and the motion must be seconded before it is put to a majority vote.  (*See* Docket No. 68-2 at 11).

From January 2016 to December 2019, the Prison Board consisted of two Democratic Commissioners, Cerilli and Ted Kopas ("Kopas"), one Republican Commissioner, Charles Anderson ("Anderson"), District Attorney John Peck ("Peck"), a Democrat, Controller Jeffrey Balzer ("Balzer"), a Republican, and Sheriff Jonathan Held,[2] also a Republican.  (Docket Nos. 59 at ¶ 4; 67 at ¶¶ 4, 134, 170, 186; 73 at ¶¶ 134, 170, 186; 60-3).  After the 2019 County election,

---

[2]      In early 2018, Held was charged with several offenses including "restricted activities—conflict of interest, 65 Pa.C.S. § 1103(a); theft by unlawful taking—moveable property […], 18 Pa.C.S. § 3921(a); and theft by diversion of services, 18 Pa.C.S. § 3926(b). The offenses related to the general allegation [Held] had commandeered taxpayer-funded employees and resources to aid in his re-election campaign during 2015 and 2016."  *Commonwealth v. Held*, 237 A.3d 1047, 2020 WL 3077930, at *1 (Pa. Super. Ct. 2020).  A jury trial held in December of 2018 resulted in a hung jury.  *Id*. at *1.  In 2022, Held pled guilty to one count of theft by diversion of services and was sentenced to 6 months' probation.  *See Comm. v. Held*, CP-65-CR-0001218-2018 (C.P. West. Cty Mar. 17, 2022).

the makeup of the Prison Board changed as two Republicans, Sean Kertes ("Kertes"), and Doug Chew ("Chew"), took office to serve as Commissioners alongside Cerilli and James Albert was elected as Sheriff.  (Docket Nos. 68-15 at 81; 68-16 at 31; 68-3 at 3; 86 at 62, 66).  During 2020, Controller Balzer and District Attorney Peck continued to serve on the Prison Board.  (Docket Nos. 59 at ¶¶ 6, 28; 67 at ¶¶ 6, 28).

The Salary Board includes the three County Commissioners and the County Controller.  (Docket No. 68-4 at 17).  The Salary Board meets four times per year and acts pursuant to a majority vote of at least three members.  (Docket No. 68-15 at 79-80).  In 2020, Cerilli was the lone Democrat on the Salary Board as the three other members were Republicans, i.e., Controller Balzer and newly elected Commissioners Kertes and Chew.  (Docket Nos 68-16 at 31; 86 at 62, 66).

### C.  2016-2018: Cerilli's Motions to Terminate Walton and Intervening Events

The parties agree that Cerilli made a total of four motions to terminate Walton at Prison Board meetings: on two separate occasions in 2016 and twice at a single meeting on November 16, 2018.  (Docket Nos. 59 at ¶¶ 8, 10, 12; 67 at ¶¶ 8, 10, 12).  However, it is uncontested that all four of these votes failed and Walton was not terminated.  (Docket Nos. 59 at ¶ 11; 67 at ¶¶ 11, 138; 73 at ¶ 138).

In January of 2016, Walton was interviewing candidates for an open sergeant position and one of Cerilli's supporters, corrections officer Robert Gettemy ("Gettemy"), applied.  (Docket Nos. 59 at ¶ 15; 67 at ¶ 15).  Gettemy supported her campaign as a poll worker and in other ways.  (*Id.*).  Several witnesses testified that there were rumors that Gettemy had told others that Cerilli had promised him the position.  (Docket No. 68-1 at 10; 68-16 at 25).  Cerilli denied that any such promise was ever made but conceded at her deposition that she wanted Gettemy to be interviewed.

(Docket No. 68-15 at 14). Walton admitted at his deposition that he never heard Cerilli ask or recommend that Gettemy be promoted to sergeant. (Docket No. 68-16 at 28). Both she and Walton testified that Gettemy was not qualified to be promoted to sergeant. (*Id.* at 31; Docket No. 86-15, at 14). On January 26, 2016, Walton recommended another candidate for promotion to sergeant. (Docket Nos. 59 at ¶¶ 15, 19, 143; 67 at ¶¶ 15, 19, 143; 60-6 at 3). While Cerilli did not vote for Gettemy to be promoted when the subject was put to a majority vote of the Prison Board, she stated that the interviews conducted by the Warden should be ignored and that the Board should conduct the interviews. (*Id.* ¶¶ 19, 23, 143). Ultimately, Gettemy's application was declined, and another corrections officer was promoted to sergeant. (Docket No. 68-16 at 69-70).

On June 27, 2016, Cerilli made her first motion to terminate Walton at a meeting of the Prison Board. (Docket Nos. 59 at ¶ 8; 67 at ¶ 8). This motion was not seconded by any other members of the Prison Board, and it failed. (Docket No. 68-16 at 112-113).

On July 25, 2016, Cerilli made another motion to terminate Walton which was seconded by Sheriff Held. (Docket Nos. 59 at ¶ 10; 67 at ¶ 10). However, the other members of the Prison Board, including the other Democratic Commissioner, Kopas, voted against the motion and it failed. (Docket No. 68-3 at 20). Cerilli commented publicly that Walton "ran the prison like a circus." (Docket Nos. 67 at ¶ 147; 73 at ¶ 147). Cerilli also publicly vowed to continue offering motions to terminate Walton's employment. (Docket Nos. 67 at ¶ 138; 73 at ¶ 138).

Cerilli did not explain her reasoning for moving to terminate Walton initially, but as time progressed, she pointed to different incidents as her reason. (Docket Nos. 68-4 at 20-21). First, she stated that Walton had misused a County truck to move a personal television to another location. (Docket Nos. 68-3 at 5). Second, she cited the alleged "preferential treatment" accorded to Walton's son who had formerly worked as a corrections officer at the prison. (Docket Nos. 59

at ¶¶ 106-108; 67 at ¶¶ 106-108).  Third, she noted misconduct which had occurred at the County Prison during Walton's tenure as Warden, including allegations of sexual harassment among corrections officers.  (Docket Nos. 60-6; 60-13).

Cerilli did not make any motions to terminate Walton at any of the Prison Board meetings which took place from August 2016 to October 2018.  (Docket Nos. 59 at ¶ 13; 67 at ¶ 13).  During this time, Cerilli avoided Walton's phone calls but reportedly told other individuals to fire him, including both former Commissioner Kopas and James Burgess ("Burgess"), who was a contractor acting in a human resources capacity for the County around that time.[3]  (Docket Nos. 59 at ¶¶ 13, 31; 67 at ¶¶ 13, 31; 68-1 at 6; 68-4 at 4).  With that said, the parties agree that neither Kopas nor Burgess possessed the authority to fire Walton because Kopas only held one vote on the Prison Board and Burgess was never on the Prison Board.  (Docket No. 68-4 at 6-7, 10-11).

In October and November of 2018, law enforcement began an investigation into allegations of human trafficking made against Hui Xu "Sherry" Caruso ("Mrs. Caruso") and her husband, Henry "Sonny" Caruso ("Mr. Caruso"), who was working as a corrections officer at the time and was a supporter in Cerilli's campaign.  (Docket Nos. 59 at ¶¶ 73-82; 67 at ¶¶ 73-82, 178; 73 at ¶ 178).  It is undisputed that the County engaged Attorney Tom Pellis to conduct an investigation, after which Mr. Caruso was suspended, with pay.  (Docket Nos. 59 at ¶ 80; 67 at ¶ 80; 60-11).  Two weeks after his suspension, on November 6, 2018, Mr. Caruso committed suicide and left a suicide letter which stated, in part, that "John Walton and Tom Pellis are responsible (sic) for my death.  They took my job and slandered my name after 25 years working for the county.  Please

---

[3]     Shortly thereafter, on September 7, 2018, Burgess filed a lawsuit against Cerilli alleging that she violated his First Amendment rights by terminating him based on perceived political affiliation.  (Docket Nos. 67 at ¶ 207; 73 at ¶ 207; 60 Defs. Ex. S; 68-31, Pl. Ex. 31).  The Honorable Marilyn J. Horan granted Cerilli's Rule 12(b)(6) motion and dismissed the case because Burgess was not a public employee.  (*Id.* at 1-2).

somebody (sic) hold them accountable. . ."  (Docket Nos. 59 at ¶¶ 82-83; 67 at ¶¶ 82-83; 60-15; 68-13).

At the next Prison Board meeting on November 16, 2018, Cerilli publicly blamed Walton for Mr. Caruso's death and made two motions to terminate him as Warden.  (Docket Nos. 59 at ¶ 12; 67 at ¶ 12; 68-11; 68-3).  Neither of her motions were seconded and they both failed.  (Docket Nos. 59 at ¶ 12; 67 at ¶ 12; 60-3).  At the time, Cerilli believed that Walton allegedly called Mr. Caruso before he committed suicide; specifically, Cerilli was told at Mr. Caruso's funeral that Walton called Mr. Caruso and threatened his pension and retirement, and stated "when I get through with you, you are going to be selling pencils on the side of the road."  (Docket No. 68-15 at 31).  But a later investigation conducted by Amanda Bernard, Director of Human Resources at the County, revealed that Mr. Caruso received only one call from his union representative on the day of his passing.  (Docket No. 68-25 at 18-19).

At this same meeting, Cerilli called Walton a "Neanderthal who could not take direction from a woman."  (Docket Nos. 67 at ¶ 189; 73 at ¶ 189).  Cerilli further commented that the position of internal affairs officer at the County jail "was just a baby-sitter for the warden."  (Docket Nos. 67 at ¶ 146; 73 ¶ 146; 68-1 at 12).  Cerilli then told the Latrobe Bulletin newspaper that she was going to continue offering motions for Walton's termination at future Prison Board meetings.  (Docket Nos. 67 at ¶ 162; 73 at ¶ 162).

Subsequently, on December 12, 2018, Cerilli authored an internal letter to the Prison Board explaining her efforts to terminate Walton.  (Docket Nos. 59 at ¶ 115; 67 at ¶ 115).  The letter reads:

> The first two motions I made to terminate the Warden occurred in June & July of 2016.  Many prison employees (mostly women) informed me of the severe misconduct & inefficiency of the prison by management.  The women disclosed alleged sexual activity

> between young female Correction Officers and male Management Personnel . . . Motions 3 and 4 to terminate Warden Walton were made on November 16, 2018 after the Warden and attorney Tom Pellis were named in former CO Sonny Caruso's suicide letter . . . It is reasonable to deduce based on what we know to this point that it is likely the Warden and Mr. Pellis went above & beyond a routine HR investigation into an alleged criminal investigation of CO Caruso.  (For the record, charges against CO Caruso's wife were dropped) . . . At this time, I also want to go on the record stating my objection and offense to the complete disrespect that the warden showed me in last month's meeting . . . As you can see, my motions for the warden's termination were based on severe misconduct & inefficiency and therefore 100% warranted and do not rise to any type of harassment.

(Docket No. 68-11).

On December 17, 2018, Walton responded with his own letter to the Prison Board wherein he asked for an investigation into Cerilli's conduct and accused her of engaging in political discrimination in violation of his First Amendment rights and creating a hostile work environment. (Docket No. 68-12).  Walton's letter alleged that Cerilli violated his rights by claiming that he was responsible for Mr. Caruso's suicide.  (*Id.*).  Walton read his letter to the Prison Board at the December 2018 meeting.  (Docket No. 68-2 at 31).  Walton's letter states, in pertinent part:

> I have been the target of both political discrimination against my first amendment rights and have endured for over three years a hostile work environment at the hand of Commissioner Gina Cerilli. Additionally, my good name and reputation in the community has been falsely ruined by her constant and public attacks on me. . . . I am making a complaint to you as the board about Commissioner Cerilli's false statements, harassment and discrimination towards me which can only be seen as an effort to constructively discharge me or force me to resign.

(Docket No. 68-12).

> D. *2019: Cerilli Campaigns, Walton Submits a Second Complaint Against Cerilli, and Files an EEOC Charge*

During Cerilli's 2019 reelection campaign, she faced criticism from political opponents, including Doug Chew, for her association with the Carusos and their involvement with human trafficking. (Docket No. 68-14). On March 11, 2019, Mrs. Caruso filed a post-death workers' compensation claim on behalf of her late husband. (Docket No. 68-23). She was represented by Attorney James Burn, who had previously represented Cerilli on an unrelated matter. (Docket Nos. 59 at ¶ 96; 67 at ¶ 96). Mrs. Caruso also posted a picture of herself and several of Cerilli's supporters on Facebook with the caption "great day for Sonny." (Docket No. 60-22). The individuals in the photo included Cerilli's father, Greg, Don Svetkovich, Mr. Caruso's father, and Attorney Burn. (Docket No. 68-16 at 143]. Based on the Facebook post and Cerilli's history of backing the Carusos, Walton and others questioned if there was some kind of a "deal" for Cerilli to support the workers' compensation claim and have him removed as Warden. (Docket Nos. 59 at ¶¶ 86, 89, 91; 67 at ¶¶ 86, 89, 91). Mrs. Caruso was ultimately convicted of several charges and the workers' compensation claim was dismissed. (Docket Nos. 67 at ¶¶ 152, 178; 73 at ¶¶ 152, 178; 68-16 at 146; 68-25 at 53).

On March 26, 2019, Cerilli and Chew engaged in a public debate stemming from an article Chew authored in the Tribune Review criticizing Cerilli for her affiliation with the Carusos. (Docket No. 68-15 at 74-75). Cerilli wrote:

> Today's Tribune Review article has me outraged and offended at the audacity of an individual to question my commitment to the cause of Human Trafficking. . . . The circumstance surrounding Mr. Caruso and his involvement or non involvement has nothing to do with my commitment to these causes. . . . My interaction with the Warden on this issue had nothing to do with the facts of the event, but everything to do with the way his internal investigation was conducted which is [a] personnel issue and I cannot disclose it. . .

(Docket No. 68-14).

Walton submitted a written internal complaint to the County alleging that Cerilli engaged in political retaliation and harassment against him on April 15, 2019. (Docket Nos. 59 at ¶ 99; 67 at ¶ 99, 100). He accused Cerilli of misrepresenting facts associated with the criminal investigation of the Carusos and demanded a public apology from Cerilli. (Docket No. 60-23). Walton's April 15, 2019 internal complaint states the following, in pertinent part:

> Please accept this written complaint as a follow-up to my prior verbal complaint to this Board requesting a formal investigation of the political retaliation and harassment of me at the hands of Commissioner Cerilli . . . I have endured this for over three years and suffered through the most hostile workplace environment one could imagine . . . it only got worse and to the absurd point where [Cerilli] actually accused me of some blame for the suicide of a suspended with pay corrections officer who was facing criminal indictment for human trafficking and money laundering. To hurt me, Commissioner Cerilli went so far as to misrepresent facts to this Board about that criminal investigation . . . All were false statements to support the claimed narrative that something in the course of a personnel investigation conducted, not by me, but by one of the most respected counsel in the County, who has handled dozens of such investigations for the County through the years, somehow was improper. It is outrageous and absurd. Yet it was made public and damaged my reputation and family . . . Discussion had taken place with regards to the resignation of Correction Officer Caruso . . . Mr. Pellis' recommendation remained that he still be given the opportunity to resign his position prior to revocation by the Prison Bard [sic] . . . [i]n fact, he said in his report that he recommended we extend medical benefits and settle with resignation. This recommendation was denied by Commissioner Cerilli . . . [a]ll that could be done was recommendations to the Prison Board who are the only ones who have the power to make that decision . . . I am embarrassed and emotionally beaten that she has berated my job performance with more untruths not only to you all but to the public at large . . . I am asking for a public apology by Commissioner Cerilli. I am asking that she retract all of the false statements made. I am asking for a complete investigation into the political harassment and retaliation and that action be taken to stop this conduct . . .

(Docket No. 68-27). Walton further asserted that a bullet was fired into his home "last week," i.e., in early April of 2019. (Docket No. 68-16 at 139-40). Walton testified that he believed the shooting

was likely connected to Cerilli's statements that he was responsible for Mr. Caruso's death because it happened close in time to the suicide and Mr. Caruso was a "big name" in the County. (*Id*.). An investigation was conducted by law enforcement, but it was never determined who shot the bullet. (*Id*.). After this episode, Walton was fearful for his safety and the Prison Board allowed him to carry a gun onto prison grounds during work hours. (Docket No. 68-15 at 82-83).

In response, the County engaged Attorney Susan B. Merrick to conduct an independent investigation of Walton's internal complaints. (Docket Nos. 59 at ¶ 100; 67 at ¶ 100). On July 1, 2019, Merrick submitted a report wherein she opines that Walton likely had no legal claims against Cerilli because the investigation revealed no reason to believe that Walton maintained affiliations of a political nature or engaged in any sort of political activity to implicate his First Amendment rights. (Docket No. 60-12). Merrick's report included allegations that one of Cerilli's supporters, Don Svetkovich, had a history of "trying to get him fired" and another former County employee, David Ridilla, left the county "due to pressure he felt from Commissioner Cerilli after he refused to hire an individual whom he did not believe to be qualified."[4] (Docket No. 68-29). On August 14, 2019, the County wrote a letter to Walton explaining that "[t]he investigation was unable to substantiate [his] allegations . . ." (Docket No. 68-30).

In September of 2019, Walton filed an EEOC charge against Cerilli and the County alleging sex and age discrimination in violation of Title VII. (Docket Nos. 60-12; 68-33). Although Walton inconsistently alleged in his Amended Complaint that the EEOC Charge was filed on September 11, 2019 or September 27, 2019, the EEOC Charge presented by the parties was signed by Walton on September 25, 2019 and stamped as received by the EEOC on September

---

[4]        Neither party has presented evidence that Ridilla filed a lawsuit against the County and there appears to be no record of such a lawsuit in state or federal court. (Docket No. 86 at 59).

27, 2019.  (*Id*.).  It is uncontested that this is the only EEOC charge Walton filed.  (Docket No. 86 at 61).

### E.  2020: Cerilli Wins Reelection; Salary Board Tables Walton's Salary Increase Request; Walton Resigns and Takes New Position With County

As noted, Cerilli won reelection and two Republicans, Chew and Kertes, joined the County as Commissioners in January of 2020.  (Docket No. 86 at 66).  Walton testified that in February of 2020, he requested a raise because two employees in the Probation Department were now earning more than he.  (Docket No. 68-16 at 9-10).  He requested an additional $6,200 to raise his annual salary to $90,000.  (Docket Nos. 86-16 at 10-11; 68-3 at 39).  In March of 2020, the COVID-19 pandemic caused Walton and his deputy to put in extra hours working in person at the jail.  (Docket No. 68-16 at 10-11).  Meanwhile, individuals in other County departments were authorized to work from home. (*Id*. at 10).  He admitted that he ultimately received two weeks of COVID-19 hazard pay from the County.  (*Id*. at 11).

It is undisputed that the Salary Board never voted on Walton's request for a raise.  (Docket Nos. 68-3 at 9, 39-40, 44-45, 51-52; 68-15 at 80-81).  Rather, the requests for pay increases by both Walton and Deputy Warden George Lowther were tabled by the Salary Board at the July 2020 meeting while raises were approved for other employees with lower pay grades at the prison. (Docket Nos. 59 at ¶ 130; 67 at ¶ 130; 68-16 at 15; 68-3 at 44).

Balzer testified that the raises were not authorized because the Commissioners did not support them at that time.  (Docket No. 68-3 at 9).  Walton explained that Commissioner Chew told him that the Salary Board did not vote on his raise request because Cerilli did not want to give him a raise.  (Docket No. 68-16 at 13-14).  Cerilli commented publicly that Walton did not receive the raise "because of the financial situation of the county."  (*Id*. at 14).  When asked at her deposition why she did not vote for Walton's raise request, Cerilli giggled and confirmed that she

had previously referred to Walton as an "asshole."  (Docket Nos. 67 at ¶ 231; 73 at ¶ 231).  Walton

has neither alleged nor presented any evidence that the other members of the Salary Board (i.e.,

Chew, Kertes and Controller Balzer) tabled his raise request due to political animus.  (*See* Docket

Nos. 20; 68; 86).

The Prison Board conducted its monthly meeting on September 28, 2020, at the conclusion

of which Walton read his resignation letter.  (Docket Nos. 68-16 at 13; 68-4).  Walton was 60 years

old when he resigned.  (Docket Nos. 67 at ¶ 237; 73 at ¶ 237).   His resignation letter read as

follows:

> I have endeavored to persevere through a long public
> character assassination and campaign of harassment by
> Commissioner Cerilli.  I did not retire or resign earlier this year
> because I felt that continuity of leadership at the prison was
> important during the unprecedented public health crisis.  However,
> I am no longer willing to tolerate the relentless and baseless
> harassment, discrimination and retaliation I have endured.
> Therefore, I hereby resign and retire as the Warden of
> Westmoreland County Prison effective November 6, 2020.

> As you are all aware, I have been subject to an endless
> barrage of threats of discharge and a public smear campaign by
> Commissioner Cerilli.  Commissioner Cerilli publicly criticized my
> suspension of her family friend, Sonny Caruso.  With the support of
> Hui Xu Caruso, who has since pleaded guilty to numerous charges
> related to human trafficking, Commissioner Cerilli publicly blamed
> me for Caruso's suicide.  I have endured public insults, false and
> defamatory accusations, and unfounded criticism of my job
> performance as Warden.   Most recently, while Westmoreland
> County employees received compensation increases, I received
> none, due to Commissioner Cerilli's personal animus.   The
> Commissioner's relentless harassment and baseless attacks on my
> character and professional performance have simply become
> intolerable and more than I am willing to bear.

> The work environment created by Commissioner Cerilli's
> harassment has adversely impacted my physical and emotional
> wellbeing.  The Commissioner's actions have caused immeasurable
> stress, tension, and even fear for my safety and the safety of my

> family.  I cannot and will not subject myself and/or my family to
> these unbearable work conditions any longer.

(Docket No. 68-34).

After his resignation, Walton worked part-time as a consultant for the County in a position

created by the Salary Board.  (Docket No. 59 at ¶ 127).  On January 25, 2021, the Prison Board,

including Cerilli, voted to appoint Bryan Kline, a male Republican, as Warden.  (Docket Nos. 59

at ¶¶ 128-29; 67 at ¶¶ 128-29).  Cerilli resigned her seat in the summer of 2023.  (Docket No. 86

at 3).

## III.   RELEVANT PROCEDURAL HISTORY

As noted, Walton filed a charge of discrimination with the EEOC, (his "EEOC Charge")

on September 27, 2019 while he was still working as Warden for the County.  (Docket No. 68-33).

He resigned his position effective November 6, 2020.  (Docket No. 68-34).  The EEOC issued a

right to sue letter on June 15, 2021.  (Docket No. 20 at ¶ 5).  Walton admits that he never amended

the EEOC Charge nor filed a new charge after his resignation.  (Docket No. 86 at 61).

On July 5, 2021, Walton filed his Complaint in this Court asserting claims of constructive

discharge based on political affiliation in violation of 42 U.S.C. § 1983; discrimination,

harassment, and retaliation in violation of Title VII and the Age Discrimination in Employment

Act, 29 U.S.C. § 621, *et seq.* ("ADEA"); and, intentional infliction of emotional distress.  (Docket

No. 1).  Walton filed an Amended Complaint on November 16, 2021, at which time he dropped

his ADEA claims.  (Docket No. 20).  On April 14, 2023, Walton voluntarily dismissed his

intentional infliction of emotional distress claim at Count III. (Docket Nos. 64, 65).  Hence, the

remaining claims in Walton's Amended Complaint include constructive discharge based on

political affiliation in violation of 42 U.S.C. § 1983 against both Defendants at Count I and

discrimination, harassment, and retaliation in violation of Title VII against the County at Count II. (Docket No. 20).

After completing discovery, Defendants filed their Motion for Summary Judgment, Concise Statement of Material Facts, Brief, and supporting appendix.  (Docket Nos. 57-60). Walton then submitted a brief in opposition, a response to Defendant's concise statement of material facts, and an appendix. (Docket Nos. 66-68).  Defendants replied and responded to Plaintiff's counterstatement of facts.  (Docket Nos. 72-73).  Plaintiff next filed a sur-reply in opposition.  (Docket No. 74).  At the direction of the Court, supplemental briefs were presented addressing the Court of Appeals' intervening decision of *Nitkin v. Main Line Health*, 67 F.4th 565 (3d Cir. May 11, 2023).  (Docket Nos. 75-77).

The Court held oral argument on June 29, 2023, the transcript of which was filed on July 27, 2023 and has been reviewed and considered by the Court.  (Docket No. 86).  The parties later filed post-hearing briefs on the admissibility of newspaper articles and investigative reports, the Court's ability to take judicial notice of public County meeting minutes, and another pertinent decision by the Court of Appeals in *O'Brien v. Middle East Forum*, 57 F.4th 110 (3d Cir. 2023). (Docket Nos. 83-85).  The Court issued a Memorandum Order on August 16, 2023 addressing the news articles and investigative reports, which is incorporated herein.  (Docket No. 87).  In short, the Court excluded the news articles because the parties had "effectively withdrawn their news article exhibits" and further held that the investigative reports would be considered only to the extent they were relevant for non-hearsay purposes.  (*Id.*).  As the motion for summary judgment is fully briefed and argued, it is now ripe for disposition.

IV.    LEGAL STANDARD

Summary Judgment is appropriate when the moving party establishes "that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a).  "A fact is 'material' under Rule 56 if its existence or nonexistence might impact the outcome of the suit under the applicable substantive law." *Baloga v. Pittston Area Sch. Dist.*, 927 F.3d 742, 752 (3d Cir. 2019) (citations omitted). Further, "[a] dispute is 'genuine' if 'a reasonable jury could return a verdict for the nonmoving party.'" *Clews v. County of Schuylkill*, 12 F.4th 353, 358 (3d Cir. 2021) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)).  However, "[w]here the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no genuine issue for trial." *N.A.A.C.P. v. North Hudson Reg'l Fire & Rescue*, 665 F.3d 464, 475 (3d Cir. 2011) (quoting *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986)).

A party seeking summary judgment "must show that if the evidentiary material of record were reduced to admissible evidence in court, it would be insufficient to permit the nonmoving party to carry its burden of proof." *Conboy v. U.S. Small Bus. Admin.*, 992 F.3d 153, 160 (3d Cir. 2021) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986)). "Once the moving party meets its initial burden, the burden then shifts to the nonmovant who must set forth specific facts showing a genuine issue for trial and may not rest upon the mere allegations, speculations, unsupported assertions or denials of its pleadings." *Conboy*, 992 F.3d at 160; *see also Matsushita*, 475 U.S. at 587. In this regard, the non-movant must come forward with more than "some metaphysical doubt as to the material facts." *Conboy*, 992 F.3d at 160; *see also Matsushita*, 475 U.S. at 586-87.

Nonetheless, a well-supported motion for summary judgment will not be defeated where the non-moving party merely reasserts factual allegations contained in the pleadings. *Betts v. New*

*Castle Youth Dev. Ctr.*, 621 F.3d 249, 252 (3d Cir. 2010) (citing *Williams v. Borough of West Chester*, 891 F.2d 458, 460 (3d Cir. 1989)). The non-moving party must resort to affidavits, deposition testimony, admissions, and/or answers to interrogatories to demonstrate the existence of a genuine issue. *Guidotti v. Legal Helpers Debt Resolution, L.L.C.*, 716 F.3d 764, 773 (3d Cir. 2013) (citing *Celotex Corp.*, 477 U.S. at 324).

V.   DISCUSSION

Defendants seek summary judgment on Walton's gender-based Title VII claims against the County and his § 1983 claims for constructive discharge due to political discrimination against both the County and Cerilli. (Docket No. 57-60, 72-73). Walton naturally opposes and argues that he has adduced sufficient evidence to present his case to a jury at trial. (Docket Nos. 66-68, 74). Having carefully considered the parties' arguments against the record, the Court finds that Walton has failed to meet his burden to demonstrate that there is a genuine dispute of material fact as to his any of his claims and will enter summary judgment in favor of Defendants. The Court's analysis follows, starting with the Title VII claims.

*A. Title VII claims*

The County initially asserts that Walton's gender-based Title VII claims are barred for failure to timely exhaust administrative remedies and alternatively, maintains that he has presented insufficient evidence to sustain these claims. (Docket No. 58 at 14, 19). Walton responds that his Title VII claims are timely because Cerilli allegedly engaged in an ongoing and "constant" course of conduct leading to his constructive discharge and further argues that his claims are saved by the continuing violation doctrine. (Docket No. 66 at 13). The Court agrees with the County and will enter summary judgment in its favor.

1.   Failure to Exhaust Administrative Remedies

Title VII claims are subject to a comprehensive remedial scheme requiring the claimant to timely exhaust administrative remedies with the EEOC prior to filing suit.  *See Williams v. Pa. Human Relations Comm.*, 870 F.3d 294, 298 (3d Cir. 2017).  "[A] claimant in a deferral state, such as Pennsylvania, must first file a complaint with the EEOC within 300 days of the alleged unlawful employment practice." *Mandel v. M & Q Packaging Corp*., 706 F.3d 157, 165 (3d Cir. 2013) (citing 42 U.S.C. § 2000e-5(e)(1)). As the Supreme Court has explained, each discrete act constitutes a separate actionable unlawful employment practice.  *Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 114 (2002).  Discrete acts include "termination, failure to promote, denial or transfer, or refusal to hire." *Id.*  "[D]iscrete discriminatory acts are not actionable if time barred, even though they are related to the acts alleged in timely filed charges." *Id*. at 113.

The continuing violation doctrine provides a limited exception which may apply if discriminatory acts which are not individually actionable are linked into a pattern of actions that extend into the applicable 300-day lookback period.  *Mandel*, 706 F.3d at 165 (quoting *O'Connor v. City of Newark*, 440 F.3d 125, 127 (3d Cir. 2006)).  Stated differently, "[t]o allege a continuing violation, the plaintiff must show that all acts which constitute the claim are part of the same unlawful employment practice and that at least one act falls within the applicable limitations period." *Id.* at 165-66 (citations omitted).  Similarly, "a Title VII hostile work environment claim is timely if any of the acts in the pattern that comprises the hostile work environment occurred within the 300-day lookback period." *McClain v. Connellsville Sch. Dist.*, No. 2:20-CV-01485-CCW, 2021 WL 1737465, at *2 (W.D. Pa. May 3, 2021); *see also O'Connor*, 440 F.3d at 127 (quoting *Morgan*, 536 U.S. at 105) ("[C]onsideration of the entire scope of a hostile work environment claim, including behavior alleged outside the statutory time period, is permissible for

purposes of assessing liability, so long as any act contributing to that hostile environment takes place within the statutory time period.").

Here, the uncontested evidence of record demonstrates that Walton filed his EEOC Charge on September 27, 2019.[5]  (Docket Nos. 60-12; 68-33).  The Court takes judicial notice that 300 days prior to that date is December 1, 2018.  *See e.g.*, *Clemena v. Phila. Coll. of Osteopathic Med.*, Civ. No. 17-428, 2017 WL 3453338, at *4 (E.D. Pa. Aug. 11, 2017) (taking judicial notice of 300-day time period for purposes of Title VII exhaustion requirement.).  Hence, any alleged Title VII violations that predate December 1, 2018 are time barred unless the continuing violation doctrine applies to save the claims.  *See Mudie v. Phila. Coll. of Osteopathic Med.*, App. No. 22-2132, 2023 WL 6210754, at *2 (3d Cir. Sept. 25, 2023).

Turning to Walton's EEOC Charge, he generally complains about alleged gender discrimination and a hostile work environment perpetuated by Cerilli and mentions a few events without providing any dates upon which they occurred.  (Docket Nos. 60-12; 68-33).  Specifically, Walton claims that: he objected to Cerilli's political hires because they had a disparate impact on qualified minorities and females; she attacked him because of his gender by making comments that he cannot take orders from a woman; and she called him a Neanderthal implying that his

---

[5]     The Court notes that Defendants argue in their brief that November 15, 2018 is 300 days prior to the filing of the EEOC Charge on September 27, 2019, (Docket No. 58 at 15), and defense counsel stated at the hearing that "perhaps the November motions to terminate fall within that 300 days, [but] certainly the June and July 2016 motions to terminate do not fall within the 300 days."  (Docket No. 86 at 16-17).  This is a mathematical error because there are 316 days between November 15, 2018 and September 27, 2019.  It appears that this misstatement may result from Plaintiff's inconsistent allegations in his Amended Complaint that the EEOC Charge was filed on September 11, 2019 or September 27, 2019.  (Docket No. 20 at ¶¶ 5, 29).  In their Answer, Defendants denied that the filing was made on September 11, 2019 and asserted that the EEOC Charge was filed on September 27, 2019.  (Docket No. 29 at ¶¶ 5, 29).  At summary judgment, Plaintiff cannot rely on his prior allegations but must move beyond the pleadings and present evidence to support his claims.  *See Nitkin*, 67 F. 4th at 571 (quoting *D.E. v. Cent. Dauphin Sch. Dist.*, 765 F.3d 260, 268 (3d Cir. 2014) (further quotation omitted) ("a plaintiff who reaches the summary judgment stage may no longer 'rest upon the mere allegations or denials of his pleading'")).  It is clear that there is not a genuine dispute of material fact on this issue because both parties have submitted the same EEOC Charge as an exhibit which was signed by Plaintiff on September 25, 2019 and is clearly stamped as received by the EEOC on September 27, 2019.  (Docket Nos. 60-12; 68-33).

gender and mental capacity made him unfit to be Warden.  (*Id.*).  Although Walton did not include

dates of these events in his EEOC Charge, the summary judgment record is uncontested that all of

these episodes took place <u>before</u> December 1, 2018.  (Docket Nos. 59; 67; 73).  To that end, the

parties agree that:

- Walton objected to the attempted political hire of Gettemy in 2016, (Docket Nos. 59 at ¶¶ 15, 19; 67 at ¶¶ 15, 19, 143; 73 at ¶ 143);

- Cerilli made unsuccessful motions to terminate Walton at the Prison Board meetings in June and July of 2016, (Docket Nos. 59 at ¶¶ 8, 10; 67 at ¶¶ 8, 10);

- Cerilli called Walton a Neanderthal and proclaimed that he could not take orders from a woman at the November 16, 2018 meeting of the Prison Board, (Docket Nos. 59 at ¶ 12; 67 at ¶¶ 12, 189; 73 at ¶ 189); and,

- Cerilli made two additional unsuccessful motions to terminate Walton at the November 16, 2018 meeting of the Prison Board, (Docket No. 60-3; 59 at ¶ 12; 67 at ¶ 12).

Since all of these episodes took place before December 1, 2018, it is Walton's burden to

establish a continuing violation by presenting evidence that "at least one component act of [the]

hostile work environment occurred within the limitations period" and "[t]o be part of the same

unlawful employment practice, component acts must involve 'similar conduct by the same

individuals, suggesting a persistent ongoing pattern.'"  *Mudie*, 2023 WL 6210754, at *3 (quoting

*Doe v. Mercy Cath. Med. Ctr.*, 850 F.3d 545, 566 (3d Cir. 2017)).  Further, the evidence must

support a reasonable inference that the acts were motivated by unlawful discrimination of the type

involved in the case.  *Id.* at *3.  By way of example, in *Mandel*, the Court of Appeals found that

the continuing violation theory applied because: (1) the plaintiff presented evidence that she was

threatened with termination and called a "bitch" during a meeting by a supervisor within the

limitations period, and (2) she had alleged several incidents prior to the limitations period which

were similar in nature and involved the same individuals, "suggesting a persistent ongoing pattern" supporting her gender-based hostile work environment claim. *Mandel*, 706 F.3d at 167.

Returning to the instant matter, while Walton generally complains about Cerilli's actions in the months following the November 16, 2018 Prison Board meeting, he has not presented evidence of Cerilli engaging in similar incidents of gender-based discrimination, retaliation or harassment which would permit him to invoke the continuing violations doctrine. (Docket Nos. 67; 68). Instead, as is discussed in § V.B. below, the evidence Walton has adduced from this time period largely involves Cerilli's political associations; his complaints of her political discrimination and retaliation; Cerilli's responses to his allegations; and, the County's internal investigation of same. *See* § V.B., *infra*. Simply put, there is no evidence Cerilli did any of the following during the lookback period of December 1, 2018 through September 27, 2019: made additional motions to terminate Walton's employment as Warden; retaliated against him for complaining that her political hires had an adverse impact on women; accused Walton of being a Neanderthal; or made similar negative comments about his gender. (Docket Nos. 67; 68). As such, the continuing violation doctrine does not save Walton's Title VII claims pertaining to discrete acts and harassment which occurred before December 1, 2018. *See Mudie*, 2023 WL 6210754, at *2.

The Court's analysis does not end here because Walton also brings claims for his alleged constructive discharge resulting from his subsequent resignation on September 28, 2020. (Docket No. 20). Walton admits that he did not file a second EEOC charge after his resignation but suggests that this claim is also saved by the continuing violations doctrine. (Docket No. 86 at 61). As the United States Court of Appeals for the Third Circuit has explained,

> [t]he "relevant test" for determining whether a later claim needs to
> be exhausted despite the filing of a previous charge is a two-pronged

> inquiry into whether "the acts alleged in the subsequent ... suit are fairly within the scope of [1] the prior EEOC complaint, or [2] the investigation arising therefrom." *Waiters v. Parsons*, 729 F.2d 233, 237 (3d Cir. 1984); *see also Robinson v. Dalton*, 107 F.3d 1018, 1025 (3d Cir. 1997) (identifying the "two circumstances in which events subsequent to a filed [EEOC] complaint may be considered as fairly encompassed within that complaint").
>
> The exhaustion inquiry is highly fact specific. Under our precedent, the Court must "examine carefully the prior pending EEOC complaint and the unexhausted claim on a case-by-case basis before determining that a second complaint need not have been filed."

*Simko v. U.S. Steel Corp*, 992 F.3d 198, 207 (3d Cir. 2021), *cert. denied sub nom. Simko v. U.S. Steel Corp.*, 142 S. Ct. 760, 211 L. Ed. 2d 476 (2022) (internal footnotes omitted) (quoting *Robinson*, 107 F.3d at 1024).

Applying those factors here, the Court holds that Walton failed to exhaust his constructive discharge claim. *See Simko*, 992 F.3d at 207. Initially, Walton's EEOC Charge was filed on September 27, 2019 which was a full year before he submitted his resignation letter on September 28, 2020. (Docket Nos. 60-12; 68-33). Due to this timeline, his EEOC Charge does not incorporate any constructive discharge allegations. (*Id.*). Instead, as the Court has noted above, his EEOC Charge contains claims for gender-based hostile work environment, discrimination and retaliation citing several time-barred discrete acts of harassment. (*Id.*).

Plaintiff has not otherwise presented any evidence demonstrating that the EEOC investigation was expanded to include his alleged constructive discharge. (Docket Nos. 67; 68). To the contrary, the EEOC closed the investigation on June 15, 2021 which was well before the time for Walton to exhaust any claim arising out of the resignation expired. *See Green v. Brennan*, 578 U.S. 547, 564 (2016) ("a constructive-discharge claim accrues—and the limitations period begins to run—when the employee gives notice of his resignation, not on the effective date of that

resignation."). As to the scope of the EEOC's investigation, Plaintiff did not present any evidence as to same beyond his EEOC Charge and the Right-to-Sue letter.  (Docket Nos. 60-12; 68-32; 68-33).  His counsel also admitted at the hearing that:

> I had the hardest time getting a Right-to-Sue letter from the Department of Justice. It went on and on and on. And I couldn't get anybody to respond to me. I think it was because of the pandemic. But was there an additional EEOC complaint or amendment? There was not.

(Docket No. 86 at 61).  All told, Walton was required to file a second EEOC Charge following his alleged constructive discharge and he had another 300-days after he submitted his resignation or until July 26, 2021 to do so.  *See Green*, 518 U.S. at 564.  Since Walton admits he did not file a second EEOC Charge, summary judgment will be entered in favor of the County on his constructive discharge claim as well.  *See Simko*, 992 F.3d at 207.

> 2.  <u>Sufficiency of Title VII Claims</u>

The Court next addresses the parties' disputes regarding the sufficiency of the evidence supporting Walton's Title VII claims.  For the reasons set forth below, the Court alternatively finds that Walton has failed to meet his burden to establish a prima facie case under any of the asserted theories.  As such, the Court need not resolve the parties' disputes as to whether the County is entitled to summary judgment on its *Faragher/Ellerth* affirmative defense and the Third Circuit's recent pronouncements in *O'Brien*, 57 F.4th at 117.  (*See* Docket Nos. 84; 85).

> i.  Gender Discrimination/Retaliation

Title VII gender discrimination and retaliation claims are evaluated under the familiar *McDonnell-Douglas* burden shifting framework whereby the plaintiff bears the burden to present a prima facie case; the burden shifts to the employer to show a legitimate, non-discriminatory or non-retaliatory reason for the employment action; and the plaintiff bears the ultimate burden to

show that the employer's proffered reasons are a pretext for discrimination or retaliation.  *See e.g.,*

*Surman v. UPMC Presbyterian Shadyside*, Civ. A. No. 17-184, 2018 WL 4901107, at *6, 12 (W.D.

Pa. Oct. 9, 2018).  To establish a prima facie case of either gender discrimination or retaliation, a

plaintiff must demonstrate, among other things, that he suffered an "adverse employment action."

*See Jones v. SE. Pa. Transp. Auth.*, 796 F.3d 323, 326 (3d Cir. 2015) ("A Title VII plaintiff must

prove that [he] suffered an adverse employment action in order to satisfy step one of *McDonnell*

*Douglas*.").

> An "adverse employment action" under Title VII is "an action by an
> employer that is 'serious and tangible enough to alter an employee's
> compensation, terms, conditions, or privileges of employment.'"
> Such an action must constitute "a significant change in employment
> status, such as hiring, firing, failing to promote, reassignment with
> significantly different responsibilities, or a decision causing a
> significant change in benefits."

*Anderson v. Mercer Cnty. Sheriff Dep't*, 815 F. App'x 664, 666 (3d Cir. 2020) (internal quotations

omitted).  On the other hand, employment actions such as lateral transfers, reassignments, negative

evaluations, suspensions with pay, denials of training requests and reprimands causing only

reputational harm, among others, do not constitute an adverse employment action if they do not

otherwise affect the employee's compensation, terms, or conditions of employment.  *See e.g.,*

*Jones*, 796 F.3d at 327 (paid suspension not an adverse employment action); *Walker v. Centocor*

*Ortho Biotech, Inc.*, 558 F. App'x 216, 219-220 (3d Cir. 2014) (a negative evaluation of employee

which did not affect eligibility for raise not adverse employment action); *Oguejiofo v. Bank of*

*Tokyo Mitsubishi UFJ Ltd*, 704 F. App'x 164, 168 (3d Cir. 2017) (reassignment without any

evidence suggesting that it significantly altered employment or prospects not an adverse

employment action); *Cross v. Postmaster Gen. of U.S.*, 696 F. App'x 92, 95 (3d Cir. 2017)

(quotation omitted) ("[a]n employer's denial of a training request, without something more, is not

itself an adverse employment action."); *DiPrato v. Bernstiel*, Civ. A. No. 21-507, 2022 WL 206183, at *4 (E.D. Pa. Jan. 24, 2022) ("DiPrato alleges harm to his professional reputation and credibility in the local legal community, and although this may constitute a cognizable claim under legal theories, he and Bradley have suffered no adverse employment action under Title VII.").

It is this Court's opinion that Walton has failed to meet his burden to establish a prima facie case for gender discrimination or retaliation because he has not presented sufficient evidence from which a reasonable jury could conclude that he sustained an adverse employment action at any point leading up to the filing of his EEOC Charge. *See Jones*, 796 F.3d at 326. For the reasons set forth in the preceding section of this Opinion, Walton did not timely exhaust his claims that Cerilli's motions to terminate him in 2016 were retaliation for him opposing unlawful employment practices nor that the motions to terminate him on November 16, 2018 were the result of gender discrimination. *See* § V.A.2, *supra*. But, even if he had timely exhausted those claims, he admits that the motions failed, and he was not terminated. (Docket Nos. 59 at ¶¶ 8, 10, 12; 67 at ¶¶ 8, 10, 12). Indeed, Walton admitted at his deposition that Cerilli lacked the authority to unilaterally terminate him or to alter his salary and benefits, and the record is uncontested that the County delegated such decisions to either the 6-person Prison Board, or the 4-person Salary Board. (Docket Nos. 59 at ¶¶ 4, 6; 67 at ¶¶ 4, 6; 68-16 at 101, 106). Stated differently, because the other board members did not vote in favor of Cerilli's motions to terminate Walton, his employer, the County, did not take an adverse employment action against him. *See Anderson*, 815 F. App'x at 666. Regardless, Walton has not presented any evidence that Cerilli's failed motions to terminate him resulted in any significant changes to his compensation or otherwise altered the terms and conditions of his employment. (*See* Docket Nos. 67; 68). He suffered, at most, a bruised ego and reputational harm which are insufficient to support Title VII disparate treatment and retaliation

claims. *See e.g.*, *Burlington Indus., Inc. v. Ellerth*, 524 U.S. 742, 761 (1998) (collecting cases stating that a "bruised ego"; a demotion without change in pay, benefits, duties, or prestige; and a reassignment to a more inconvenient job did not constitute adverse employment actions) (citations and quotations omitted).

Overall, since Walton continued to serve as the Warden for the Westmoreland County Prison throughout the entire 300-day lookback period, he has not presented sufficient evidence to establish a prima facie case of disparate treatment or retaliation and a reasonable jury could not conclude that the County is liable for his Title VII disparate treatment or retaliation claims. *See Anderson*, 815 F. App'x at 666 (affirming grant of summary judgment as lateral transfer of deputy sheriff did not alter terms and conditions of employment and plaintiff maintained same rank, salary and benefits); *see also Jones*, 796 F.3d at 326 (paid suspension with same salary and benefits pending investigation of employee's own wrongdoing does not constitute adverse employment action).

ii.  Harassment/Hostile Work Environment

Title VII hostile work environment claims are distinct from discrimination and retaliation claims because they are not subject to the *McDonnell-Douglas* burden shifting analysis and such claims can exist when harassment does not result in a tangible employment action. *See Pa. State Police v. Suders*, 542 U.S. 129, 144 (2004); *see also Moody v. Atlantic City Bd. of Educ.*, 870 F.3d 206, 213, n. 11 (3d Cir. 2017).  To prove a hostile work environment claim, Walton must show "(1) that he suffered intentional discrimination because of his sex; (2) that the discrimination was severe or pervasive; (3) that the discrimination detrimentally affected the plaintiff; (4) that the discrimination would detrimentally affect a reasonable person in like circumstances; and (5) that there was respondeat superior liability." *Nitkin*, 67 F.4th at 570.  The Court considers the totality

26

of the circumstances, including "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 23 (1993). "The 'severe or pervasive' standard requires conduct that is sufficient 'to alter the conditions of [the employee's] employment and create an abusive working environment.'" *Moody*, 870 F.3d at 214 (quoting *Meritor Sav. Bank, FSB v. Vinson*, 477 U.S. 57, 67 (1986)). "[O]ffhanded comments and isolated incidents (unless extremely serious) are not sufficient to sustain a hostile work environment claim." *Caver v. City of Trenton*, 420 F.3d 243, 262 (3d Cir. 2005) (internal quotations and citations omitted). Similarly, offensive conduct that renders the employee's work life unpleasant or uncomfortable and offensive utterances that are neither severe nor pervasive are not enough to sustain a hostile work environment claim. *See Nitkin*, 67 F.4th at 571 (determining that one or two statements over a six-month period were not severe or pervasive). "Severe" and "pervasive" are "alternative possibilities: some harassment may be severe enough to contaminate an environment even if not pervasive; other, less objectionable, conduct will contaminate the workplace only if it is pervasive." *Castleberry v. STI Grp.*, 863 F.3d 259, 264 (3d Cir. 2017).

After reviewing the evidence in the light most favorable to Walton, the Court holds that a reasonable jury could not find that Walton was subject to severe or pervasive gender-based harassment. *See Nitkin*, 67 F.4th at 571. The Court is cognizant of the need to consider the totality of the circumstances and to not parse out the individual events in isolation. *See Mandel*, 706 F.3d at 168. With that said, "vague statements" and "conclusory allegations of inappropriate remarks are inadequate at the summary judgment stage." *Nitkin*, 67 F.4th at 571, n.3. As such, the Court need not credit Walton's unsupported assertions that Cerilli's harassment was "constant,"

"relentless," and the like but must focus on the specific instances of harassment supported by evidence in the record. *See id.; see also Dreshman v. Henry Clay Villa*, 733 F. Supp. 2d 597, 612-13 (W.D. Pa. Aug. 11, 2010) (rejecting unsupported assertions and focusing on incidents supported by testimony and other evidence). Since severe or pervasive harassment are alternative theories, the Court considers both, in turn. *See Castleberry*, 863 F.3d at 264.

As to the severity of the alleged harassment, Walton primarily argues that Cerilli's statements at the November 16, 2018 Prison Board meeting constitute severe harassment because she: called him a Neanderthal who could not take direction from a woman; questioned whether his actions during an HR investigation of a corrections officer (who was one of her political supporters) led to that individual's suicide; and made two motions to terminate him as Warden, both of which failed. (Docket Nos. 66; 74; 76). The Court has already explained why any alleged harassment arising out of this November 2018 episode is time barred. *See* § V.A.2, *supra*. However, even if Walton had timely exhausted his harassment claims, Cerilli's gender-based comments during her public rebuke of Walton at the November 2018 meeting constituted at most, mere offensive utterances. *See Nitkin*, 67 F. 4th at 571 (mere offensive utterances are not enough to constitute severe harassment). Walton's claims that he was harassed based on politics or other non-covered factors are not actionable because "Title VII protects a plaintiff only as to harassment based on discrimination against a protected class." *Ulrich v. U.S. Sec'y of Veterans Affairs*, 457 F. App'x. 132, 140 (3d Cir. 2012). *See also Williams v. Pa. Hum. Rels. Comm'n*, Civ. A. No. 14-1290, 2016 WL 6834612, at *22 (W.D. Pa. Nov. 21, 2016), *aff'd*, 870 F.3d 294 (3d Cir. 2017) ("The 'legend in her own mind' comment, though unkind is not any epithet based on race or sex."). Of course, the fact that the alleged harasser, Cerilli, is a woman is not enough to show that she harbored discriminatory animus toward Walton because of his gender. *See Wiggins v. Universal*

28

*Prot. Serv., LLC*, No. 23-1054, 2023 WL 5014082, at *3 (3d Cir. Aug. 7, 2023) (citing *Iadimarco v. Runyon*, 190 F.3d 151, 156 (3d Cir. 1999)) ("Wiggins relies largely on the fact that O'Rourke and Watson are women, but that alone is not enough to show discriminatory animus.").

In addition, this Court believes that that Cerilli's unprofessional comments toward Walton at the November 16, 2018 meeting are a "far cry" from the types of gender-based harassment which courts have deemed sufficiently severe to present to a jury, such as cases involving sexual harassment, sexual assault, serious threats of physical contact, and actual physical abuse. *See e.g., Nitkin*, 67 F.4th at 572 (collecting cases).[6]   The Court of Appeals has also determined that numerous cases involving arguably much more significant offensive conduct have been deemed not sufficiently severe to survive summary judgment. *See e.g., Sessoms v. Trs. of Univ. of Pa.*, 739 F. App'x 84, 90 (3d Cir. 2018) ("Sessoms recounts a single incident in which Colavita made unwanted physical contact with Sessoms's legs. This incident, while inappropriate and unwelcome, was not so egregious as to amount to a 'change in the terms and conditions of employment.'"); *Szyper v. Am. Med. Response Mid-Atl., Inc.*, App. No. 21-3272, 2023 WL 2597585, at *1 (3d Cir. Mar. 22, 2023) (male coworker grabbed female plaintiff's wrist and made two crude and offensive sexual comments but this was isolated incident and not "extremely serious" to support a claim of severe harassment or hostile work environment).

With respect to the pervasiveness of the alleged harassment, Walton has only pointed to a few concrete instances supporting his claims of Cerilli's gender-based harassment which took

---

[6]         In *Nitkin*, 67 F.4th at 572, the Court of Appeals cited to the following authorities: *Starnes v. Butler Cnty. Ct. of Common Pleas, 50th Jud. Dist.*, 971 F.3d 416, 428 (3d Cir. 2020) (supervisor "coerced [plaintiff] into engaging in sexual relations, shared pornography with her, asked her to film herself performing sexual acts, engaged in a pattern of flirtatious behavior, scolded her for speaking with male colleagues, [and] assigned her duties forcing her to be close to him"); *Moody*, 870 F.3d at 215 (in addition to repeatedly propositioning plaintiff, her supervisor "grabbed her," exposed himself to her, and "attempted to take her shirt off"); *Durham Life Ins. Co. v. Evans*, 166 F.3d 139, 146–47 (3d Cir. 1999) (supervisor told plaintiff she "made too much money" for a woman, belittled her, and "grabbed [her] buttocks from behind while she was bending over her files and told her that she smelled good").

place during the entirety of his employment with the County.  (Docket Nos. 66; 75; 76).  To that end, Walton suggests that Cerilli's 2016 and 2018 failed motions to terminate Walton were because of his opposition to gender-based discrimination and/or because of his gender. (Docket No. 66 at 17; 74, at 3; 68-14 at 3-13; 59 at ¶ 11; 67 at ¶¶ 11, 138; 73 at ¶ 138).  In 2018, Cerilli called him a Neanderthal, stated that he could not take direction from a woman and threatened to continue making motions to terminate him, although she did not do so.  (Docket Nos. 67 at ¶¶ 189, 233, 236, 242; 73 at ¶¶ 189, 233, 236, 242; 68-16 at 13-16).  Later, in 2020, Cerilli called Walton an "asshole," but it is unclear if the comment was even directed to him.  (Docket Nos. 67 at ¶ 231; 73 at ¶ 231).  In this Court's estimation, even if Walton's claims were timely, a total of five or six non-severe instances of alleged gender-based harassment during a four-year period are insufficient as a matter of law to support a Title VII hostile work environment claim.  *See, e.g.*, *Nitkin*, 67 F.4th at 571 (seven comments over a three-and-a-half-year period and one or two statements in a given six-month period were not severe or pervasive); *Dreshman*, 733 F. Supp. 2d at 614 (stating "it cannot be said that four of five such incidents, which occurred over a seven year period, and involved such a minimal touching of his person, constitute actionable severe and pervasive sexual harassment").

Given that Walton has not presented sufficient evidence to create a genuine issue of material fact that he was subject to severe or pervasive harassment, he has failed to meet his burden to establish a prima facie case and the Court need not resolve the parties' disputes as to whether Cerilli was an alter ego of the County nor the applicability of the *Faragher-Ellerth* defense.  *See Nitkin*, 67 F.4th at 573, n.5.  Therefore, summary judgment will be entered in favor of the County on Walton's Title VII harassment/hostile work environment claims.

iii.   Constructive Discharge

Although Walton's Title VII constructive discharge claim is untimely, the Court alternatively holds that this claim fails on the merits, as well.  Our Court of Appeals has recognized that "[t]he degree of harassment necessary to prove constructive discharge is greater than the minimum needed to prove a hostile work environment." *Jennings-Fowler v. City of Scranton*, 680 F. App'x 112, 117-18 (3d Cir. 2017) (citing *Spencer v. Wal-Mart Stores, Inc.*, 469 F.3d 311, 316 n.4 (3d Cir. 2006)).  Because Walton has failed to demonstrate that Cerilli's alleged conduct is "sufficiently severe or pervasive to constitute a hostile work environment claim, it also falls short of a constructive discharge claim." *Id.*  Finally, for the reasons set forth in § V.B.2 below, Walton's subjective reasons for his voluntary resignation are woefully insufficient to meet his burden to present objective evidence establishing a constructive discharge under the legal test set forth by the United States Court of Appeals for the Third Circuit.  *See Colwell v. Rite Aid Corp.*, 602 F.3d 495, 502 (3d Cir. 2010).

3.   Conclusion

Based on the above analysis, the Court finds that Walton failed to timely exhaust administrative remedies regarding his Title VII claims and has otherwise not presented sufficient evidence showing that: he sustained an adverse employment action; was subject to severe or pervasive gender-based harassment; nor that he was constructively discharged.  Accordingly, the County's motion for summary judgment is granted as to Walton's Title VII claims at Count II.

B.  *Section 1983 Claims Against the County and Cerilli*

Defendants next argue that Walton's § 1983 political discrimination claims are partially barred by the applicable statute of limitations to the extent that he complains of events which took place more than two years prior to his filing of this lawsuit on July 5, 2021 and that he has not

otherwise presented sufficient evidence to sustain his claims. (Docket Nos. 58; 72). Walton responds that he has timely asserted his constructive discharge claims and that he has met his burden to support same with the record evidence developed through discovery. (Docket Nos. 66; 74; 76). After thoroughly evaluating the evidence of record and the parties' arguments, the Court holds that Walton has not presented sufficient evidence to create a genuine issue of material fact and that Defendants are entitled to summary judgment on the § 1983 claims.

### 1. Statute of Limitations

Unlike Title VII claims, "§ 1983 has only a one-step 'remedial scheme': plaintiffs may file § 1983 suits directly in federal court. There is neither an administrative process to be exhausted nor any mechanism by which discriminatory practices may be informally resolved with an administrative agency." *Williams*, 870 F.3d at 298-99 (citations omitted). Section 1983 provides a cause of action for violations of a federally protected right under the U.S. Constitution or a federal statute. *See Dique v. N.J. State Police*, 603 F.3d 181, 185 (3d Cir. 2010). "The statute of limitations for a § 1983 claim arising in Pennsylvania is two years." *Montanez v. Sec'y Pa. Dep't of Corr.*, 773 F.3d 472, 480 (3d Cir. 2014) (citing *Kach v. Hose*, 589 F.3d 626, 634 (3d Cir. 2009)). "Under federal law, a cause of action accrues 'when the plaintiff knew or should have known of the injury upon which the action is based.'" *Id*. (quoting *Kach*, 589 F.3d at 634) (further quotations omitted).

As in Title VII cases, the continuing violation doctrine provides an equitable exception to the statute of limitations in § 1983 cases. *Montanez*, 773 F.3d at 481. In this regard, "when a defendant's conduct is part of a continuing practice, an action is timely so long as the last act evidencing the continuing practice falls within the limitations period." *Id*. at 481 (quoting *Cowell v. Palmer Twp.*, 263 F.3d 286, 292 (3d Cir. 2001)). However, "the continuing violation doctrine does not apply when the plaintiff 'is aware of the injury at the time it occurred,'" *id*. at 481 (quoting

*Morganroth & Morganroth v. Norris, McLaughlin & Marcus, P.C.*, 331 F.3d 406, 417 n. 6 (3d Cir. 2003)), and a "'continuing violation is occasioned by continual unlawful *acts*, not continual ill effects from an original violation.'" *Id*. at 481 (quoting *Weis–Buy Servs., Inc. v. Paglia*, 411 F.3d 415, 423 (3d Cir. 2005)) (emphasis in original).

In this Court's view, since this lawsuit was filed on July 5, 2021, the 2-year statute of limitations bars any claims arising before July 5, 2019, including Cerilli's failed motions to terminate him in 2016 and 2018. *See Montanez*, 773 F.3d at 481. The continuing violation doctrine does not save Walton's earlier claims for several reasons.

Moreover, as the Court has already explained above, the 2016 and 2018 episodes were factually distinct and separated by a period of more than two years during which Cerilli and Walton had limited contact and she did not make any additional motions to terminate him. *See* § V.A., *supra*. It is likewise uncontested that Cerilli did not make any further motions to terminate Walton's employment prior to his announcement of his resignation on September 28, 2020. (Docket Nos. 59; 67; 73). Aside from the resignation, the only other event which took place within the 2-year limitations period is the alleged denial of Walton's raise in July of 2020. However, Walton admitted that he had never requested a raise before, and the evidence shows that his request for a raise was not denied but tabled for a vote of the 4-person Salary Board at a later meeting. (Docket Nos. 59 at ¶ 130; 67 at ¶ 130; 68-16 at 15; 68-3 at 44). After considering the totality of the circumstances, the Court concludes that Walton has not established a continuing violation but merely shown a series of isolated, discrete acts, which took place over a period of more than four years. *See O'Connor*, 440 F.3d at 127-28.

Walton was also plainly aware of the alleged harm caused by Cerilli's political attacks against him at the November 16, 2018 meeting. *See Montanez*, 773 F.3d at 481. In fact, he made

internal complaints to the County in December of 2018 and April of 2019 alleging that she engaged in political discrimination and harassment and damaged his reputation by her false accusations that he was responsible for the correction officer's suicide.  (Docket Nos. 68-12; 68-27).  Walton could have brought his First Amendment claims in federal court immediately under those theories and/or advanced a "stigma plus" due process claim alleging that Cerilli's public attacks harmed his liberty interest in his reputation.[7]  *See e.g., Dondero v. Lower Milford Twp.*, 5 F.4th 355, 360 (3d Cir. 2021) (citing *Hill v. Borough of Kutztown*, 455 F.3d 225, 236 (3d Cir. 2006)) (noting elements of "stigma plus" claim including that a defendant made false statements publicly damaging the reputation of a public employee); *O'Connor*, 440 F.3d at 127-28 ("First Amendment retaliation claims are always individually actionable, even when relatively minor … if under the circumstances it would be sufficient to deter a person of ordinary firmness from exercising his or her First Amendment rights.").  Finally, the facts that Walton cited as to the continuing ill effects and damage to his reputation by Cerilli's earlier attacks at the time of his later resignation are insufficient to invoke the continuing violation doctrine.  *See Montanez*, 773 F.3d at 481.

In conclusion, Defendants' motion for summary judgment is granted to the extent that they argue that any § 1983 political discrimination claims arising prior to July 5, 2019 are time-barred because the record reflects that Walton has not demonstrated a continuing violation.[8]  *See Montanez*, 773 F.3d at 480-81.

---

[7]     The Court notes that Walton could have sued Cerilli in state court for defamation, but any such claims are subject to a shorter 1-year statute of limitations and were therefore time barred before this lawsuit was filed. *See Polysciences, Inc. v. Masrud*, App. No. 22-1767, 2023 WL 3377084, at *2 (3d Cir. May 11, 2023) (citing 42 Pa. Cons. Stat. § 5523(1)) ("An action for defamation or slander under Pennsylvania law is subject to a one-year statute of limitations.").

[8]     Walton has not asserted that his § 1983 claims are subject to equitable tolling or any other theory which would potentially save them from dismissal. (Docket Nos. 66; 74; 76).  Therefore, he has waived any such arguments. *See e.g., Williams v. Borough of Highland Park*, 707 F. App'x 72, 76 (3d Cir. 2017) (refusing to consider equitable tolling argument on appeal because "f]ailure to raise an issue in the district court, […] means that it was forfeited.").

2.   § 1983 Political Discrimination

The Court next turns to Walton's § 1983 political discrimination claims that he was denied a raise and constructively discharged due to his non-support of Cerilli and her politics.  (Docket Nos. 20; 66; 74; 76).   The freedom to associate is protected by the First Amendment and encompasses the rights to associate for the purpose of engaging in free speech, assembly, petition for the redress of grievances, and the exercise of religion.  *Roberts v. U.S. Jaycees*, 468 U.S. 609, 617-18 (1984).   "Freedom of association is potentially infringed through political patronage dismissals—a practice wherein 'a newly elected official fires employees under his control merely because of their political beliefs or associations.'"  *Burkley v. Westmoreland Cnty.*, 991 F. Supp. 2d 669, 673-74 (W.D. Pa. 2014) (citation omitted). In addition, a public employee's association rights extend to cover the right to not support a candidate, even if he or she is from the same political party, as is the case here.  *See Galli v. N.J. Meadowlands Comm'n*, 490 F.3d 265, 272-73 (3d Cir. 2007); *see also Otero v. Port Auth. of N.Y. & N.J. Port Auth.*, App. No. 21-2772, 2022 WL 2826440, at *3 (3d Cir. July 20, 2022) (quoting *Rutan v. Republican Party of Ill.*, 497 U.S. 62, 76 (1990)) ("the right to associate also extends to the concomitant right 'to not believe and not associate' with a particular political ideology.").

To sustain a claim of political discrimination in violation of the right of association, a plaintiff must show:

> (1) that he was employed at a public agency in a position that does not require political affiliation; (2) that he was engaged in constitutionally protected conduct; and (3) that this conduct was a substantial or motivating factor in the government's employment decision. *Id.* If Plaintiff succeeds in making this showing, Defendants may avoid liability "by proving by a preponderance of the evidence that the same employment action would have been taken in the absence of the protected activity."

35

*Burkley*, 991 F. Supp. 2d at 674 (quoting *Galli*, 490 F.3d at 271).

With respect to the issue of causation, the County can only be liable under § 1983 if it has caused a constitutional tort through "a policy statement, ordinance, regulation, or decision officially adopted and promulgated by that body's officers." *Monell v. Dep't of Soc. Servs. of City of N.Y.*, 436 U.S. 658, 690 (1978).

> An individual's conduct implements official policy or practice under several types of circumstances, including when (1) the individual acted pursuant to a formal government policy or a standard operating procedure long accepted within the government entity, (2) the individual himself has final policy-making authority such that his conduct represents official policy, or (3) a final policy-maker renders the individual's conduct official for liability purposes by having delegated to him authority to act or speak for the government, or by ratifying the conduct or speech after it has occurred.

*Hill*, 455 F.3d at 245.  On the last point, the Court must ascertain "(1) whether, as a matter of state law, the official is responsible for making policy in the particular area of municipal business in question, [...] and (2) whether the official's authority to make policy in that area is final and unreviewable." *Id*. at 245 (citations omitted).

Hence, if the final decision maker is a board of individuals, the "decision-making body cannot be liable when less than a majority of its members act with an impermissible purpose." *Watson v. Borough of Susquehanna*, 532 F. App'x 233, 236 (3d Cir. 2013) (citing *LaVerdure v. Cnty. of Montgomery*, 324 F.3d 123, 125-26 (3d Cir. 2003)).  Similarly, "an individual decision maker [cannot be] liable when less than a majority of the decision-making body acted for an impermissible [...] reason." *Id*. at 236 (citing *Coogan v. Smyers*, 134 F.3d 479, 485 (2d Cir. 1998)); *see also Castagna v. W. Mifflin Area Sch. Dist.*, Civ. A. No. 2:18-CV-00894, 2020 WL 3619698, at *10 (W.D. Pa. July 2, 2020) (Lenihan, M.J.) ("As a School District Superintendent,

Plaintiff could be terminated […] by a majority vote of the Board, and a single vote improperly motivated does not give rise to a First Amendment cause of action where it does not affect the vote's outcome.").

Here, the parties do not wholly contest that Walton has met the first two elements of his political discrimination claim, and the Court believes that the evidence is sufficient to establish that the Warden position did not require a political affiliation and despite them both being Democrats, Walton had a right to not associate with Cerilli and her politics.  (Docket Nos. 58; 66; 72; 74).  The crux of the parties' disputes is whether Walton has met his burden to show that his protected activities were a substantial or motivating factor in the government's employment decision.  (*Id*.).  Although Walton primarily focuses on his constructive discharge, he has arguably raised a claim challenging the denial of a raise which warrants further discussion.  (*Id*.).  The Court will consider the sufficiency of both claims, starting with the alleged constructive discharge.

      i.    Constructive Discharge

Since Walton alleges that he was constructively discharged, his First Amendment claim cannot "go to a jury unless there is a genuine dispute as to whether [he] [was] constructively discharged or […] voluntarily resigned."  *Judge v. Shikellamy Sch. Dist.*, 905 F.3d 122, 125 (3d Cir. 2018) (citations omitted).  Third Circuit "case law establishes a presumption that when employees resign, they do so freely, so the onus is on [the plaintiff] to produce 'evidence to establish that the resignation . . . was involuntarily procured.'"  *Judge*, 905 F.3d at 125 (quoting *Leheny v. City of Pittsburgh*, 183 F.3d 220, 227 (3d Cir. 1999)).  "Retirements are presumed voluntary unless they are caused by coercion, duress, or deception."  *Errington v. City of Reading et al.*, App. No. 22-1073, 2022 WL 17336209, at *2 (3d Cir. 2022) (citation omitted).  In cases like this one, where the plaintiff does not claim that he was deceived, he must show that his

resignation was procured by coercion or duress. *Judge*, 905 F.3d at 125.  With that said, the

ultimate issue is not what a plaintiff subjectively believed; rather, an objective standard is applied

which asks whether a reasonable person under the circumstances would "have felt compelled to

resign." *Colwell*, 602 F.3d at 502 (citation omitted).  The Court is directed to consider:

> a non-exhaustive list of factors to evaluate whether a retirement is a
> constructive discharge, including (1) whether the employee was
> given an alternative to resignation; (2) did he understand his choice;
> (3) whether he had a reasonable amount of time to decide; (4)
> whether he could select the effective date of the resignation; and (5)
> did he have the opportunity to gain the advice of counsel.

*Errington*, 2022 WL 17336209, at *2 (citation omitted).

A careful review of these factors leads the Court to conclude that Walton's resignation was

voluntary because he has not presented sufficient evidence to create a genuine issue for trial as to

any of these factors.  *See Judge*, 905 F.3d at 125.  To the contrary, the record plainly reflects that

Walton had the option to remain serving as Warden at the time that he resigned, and he did so

without any pending motions to terminate him or any other threat of impending termination.  *See*

*Errington*, 2022 WL 17336209, at *2.  There is also no evidence in this record indicating any of

the other five individuals who were on the Prison Board on September 28, 2020 wanted to

terminate him nor that they would have supported Cerilli if she had renewed her motions to

terminate at that time. (*See generally* Docket Nos. 60; 68).  Balzer and Peck both testified that

Walton did a good job as Warden. (Docket Nos. 68-3 at 18; 68-2 at 4).  Walton did not depose the

other three members who took their respective offices in 2020, (i.e., Sheriff Albert and

Commissioners Chew and Kertes), and he has not pointed to any evidence suggesting that they

wanted him fired. (*See generally* Docket Nos. 67; 68).  Hence, even if Cerilli still wanted to

terminate him at that time, there is no evidence that the other members of the Prison Board would

have voted in favor of such a measure. *See Errington*, 2022 WL 17336209, at *2.

It likewise appears that Walton had ample opportunity to consider how to proceed and the ability to consult with counsel because he tendered his resignation approximately twenty-two months after Cerilli's political attacks and failed motions to terminate him during the November 16, 2018 meeting which remain the focus of his claims.  (*See* Docket Nos. 60-23; 68-12; 68-34).  He admitted during his deposition that he had discussed his potential retirement with others before he resigned and started collecting retirement benefits immediately thereafter, indicating that he understood his choice and weighed the benefits of electing retirement versus continuing to work.  (*See* Docket Nos. 68-6 at 10-11; 68-16 at 8).  Walton's resignation letter further reveals that he had delayed his retirement several months in 2020 due to his belief that continuity of leadership at the jail was necessary during the "unprecedented health crisis" at the outset of the COVID-19 pandemic.  (Docket No. 68-34).  He also set the effective date of his resignation approximately six weeks in the future, and then worked as a consultant for the County after his retirement.  (Docket Nos. 59 at ¶ 127; 68-34).  Walton's continued employment at the County after his announced resignation clearly undermines his subjective statements that the conditions he faced working there were intolerable.  *See Green*, 578 U.S. at 563 ("A claim of constructive discharge requires proof of a causal link between the allegedly intolerable conditions and the resignation.").  In sum, the Court holds that the totality of the circumstances in this case would not lead a reasonable employee to conclude that he had no choice but to resign or retire.  *See Judge*, 905 F.3d at 125; *see also Errington*, 2022 WL 17336209, at *2.  As such, the Court will grant Defendants' motion for summary judgment on Walton's § 1983 constructive discharge claim at Count I.

   ii.  Denial of Raise

Walton also complains that the alleged denial of his request for a raise in July of 2020 violated his First Amendment rights.  (Docket No. 20).  As noted, he retains the burden to show

that his constitutionally protected conduct was a "substantial or motivating factor" in this decision. *Burkley*, 991 F. Supp. 2d at 674. "'Implicit in this prong is a requirement that the plaintiff produce sufficient evidence to show that the defendant knew of the plaintiff's political persuasion,' which requires proof of both knowledge and causation." *Galli*, 490 F.3d at 275 (quoting *Goodman v. Pennsylvania Turnpike Comm'n*, 293 F.3d 655, 664 (3d Cir. 2002)). The record is uncontested that decisions on salary increases and requests for raises were made by the 4-person Salary Board and that Cerilli could not unilaterally make adjustments to his salary. (Docket No 86 at 62-66). Thus, Walton must produce evidence demonstrating that at least two of the County decisionmakers on the Salary Board knew that he did not support Cerilli's politics and that this protected affiliation (or lack thereof) was a substantial or motivating factor in their votes denying his request for a raise. *See Watson*, 532 F. App'x at 236.

After reviewing the evidence in the light most favorable to Walton, he has not met his burden to create a genuine dispute for trial that his raise request was denied due to political discrimination. *See Watson*, 532 F. App'x at 236. Walton admitted at his deposition that the Salary Board never voted on his request for a raise. (Docket No. 68-16 at 12; 86 at 62-66). Instead, the record shows that the requests for raises by Walton and his Deputy Lowther were tabled until the next quarterly meeting of the Salary Board which would have taken place in October of 2020 or the month after he announced his resignation. (Docket Nos. 59 at ¶ 130; 67 at ¶¶ 130; 68-3 at 44; 68-16 at 16). It is also uncontested that Commissioners Chew and Kertes are Republicans and were Cerilli's political opponents because they both ran against her in the 2019 election, with each winning one of the three Commissioner seats. (Docket Nos. 68-14; 86 at 62-66). Hence, Chew and Kertes did not take office until January of 2020 which was several months after Walton was

informed that his internal complaints of political discrimination were dismissed by the County. (*See* Docket No. 68-30).

It appears that there is sufficient evidence to establish that Cerilli and the longtime controller, Balzer, were aware that Walton opposed Cerilli's politics, and that Balzer supported the request for a raise while Cerilli did not.  (Docket No. 68-3 at 9-10, 39-41).  Walton has also proffered ample evidence from which a reasonable jury could infer that Cerilli had animus toward him due to his refusal to support her in the past.  (*See generally* Docket Nos. 68-15; 68-16).  However, Walton has not presented sufficient evidence as to the knowledge of Walton's protected political affiliation (or lack thereof) by the other voting members of the Salary Board, i.e., Kertes and Chew, nor that Walton's protected affiliation was the reason why they declined to approve his raise request at the time.  *See e.g., Ditzler v. Hous. Auth. of City of Nanticoke*, 171 F. Supp. 3d 363, 370 (M.D. Pa. 2016) ("While the plaintiff provides significant evidence regarding DeLuca's actions and knowledge, she, unfortunately, provides no evidence that the Board members had any knowledge of the plaintiff's political affiliation, Pape's political affiliation, or DeLuca's political motivations.").  As pointed out above, Kertes and Chew were not deposed.  (*See generally* Docket Nos. 60; 68).  Balzer explained that Walton's request for a raise was not approved because Cerilli and the other two Commissioners did not support it and they agreed to table the request.  (Docket No. 68-3 at 9-10; 39-41).  Balzer further stated on cross examination that he did not recall if he and Chew were in favor of the raises while Cerilli and Kertes were opposed but he added that the measure would not get out of the Salary Board if the votes were split, with two in favor and two opposed.  (*Id*. at 51-52).

The only other evidence in the record concerning Chew and Kertes' positions are hearsay statements from Walton and Cerilli which do not suffice to create a genuine dispute of material

fact supporting a prima facie case of political discrimination.  *See Watson*, 532 F. App'x at 236.

Walton testified that Chew blamed Cerilli for the raise request not being approved but Chew did

not specify why beyond telling Walton that "[Cerilli] didn't want to give you a raise."  (Docket

No. 68-16 at 14).  Walton did not discuss Kertes at all during his deposition.  (*See* Docket No. 68-

16).  On the other hand, Cerilli testified that Kertes told Walton at the time he resigned that he was

scheduled to get a raise at the next meeting of the Salary Board in October of 2020.  (Docket No.

68-15 at 79-81).  Again, Kertes and Chew are Cerilli's political opponents, and a reasonable jury

could not infer from this evidence that they voted to table or deny Walton's request for a raise

because of his opposition or refusal to support Cerilli's politics.  *See Watson*, 532 F. App'x at 236.

Walton has not pointed to any other evidence which would raise an inference that the Salary

Board's tabling of his raise request was the result of discrimination based on his anti-Cerilli

political affiliation.  (Docket Nos. 66; 67; 74; 76).  In particular, Walton has not presented any

evidence of the political affiliation of the other prison employees who were considered for raises

around the same time, and he has therefore failed to demonstrate that similarly situated prison

employees were treated the same or differently because of their own political affiliations. *See*

*Robertson v. Fiore*, 62 F.3d 596, 601 (3d Cir. 1995) ("Robertson fails to identify the similarly

situated employees who he alleges also [broke the employer's] rules and does not identify their

political affiliation to permit a relevant comparison.").  To that end, Walton argues that the Prison

Board approved raises for other non-union prison employees in July of 2020 but he has not offered

any evidence indicating that these individuals were Cerilli's supporters which would raise an

inference of political discrimination.  *See Wheeler v. Twp. of Edison*, 326 F. App'x 118, 122-23

(3d Cir. 2009) ("the Appellant offers no evidence indicating which members of the command staff

were, in fact, Choi supporters, offering only conjecture that the two votes against Appellant came

from hypothetical Choi supporters. This is insufficient.").  Walton was also not similarly situated to these lower ranking employees because he had a higher rank and pay scale.  *See Robertson*, 62 F.3d at 601.  Finally, Deputy Lowther's raise request was also tabled but there is no evidence of his political affiliation which precludes the factfinder from making a relevant comparison to Walton which would support an inference of political discrimination.  *Id.*

For all of these reasons, the Court finds that Walton has failed to meet his burden to present sufficient evidence to create a genuine issue of material fact that his own politics were a substantial or motivating factor in the July 2020 denial of his raise request, and he has not established a prima facie case of political discrimination.  *See Watson*, 532 F. App'x at 236.  It is insufficient as a matter of law for Walton to rely solely on the evidence he has adduced showing that Cerilli may have voted to deny his raise request for an unconstitutional reason because he needed to present evidence showing a genuine dispute of material fact that the other decisionmakers on the Salary Board acted with the same impermissible purpose.  *See id.*  Walton was afforded ample opportunity to develop the record during the discovery period in this case, but he declined to depose Chew and Kertes and has not presented any evidence from which a reasonable juror could conclude that they acted with an impermissible purpose.  *See id.*  Therefore, the Court will grant Defendants' motion for summary judgment as to Plaintiff's § 1983 claim for political discrimination regarding the alleged denial of his raise request.

3.  Conclusion

As the Court has explained above, Defendants are entitled to summary judgment because Walton's § 1983 political discrimination claims are time-barred and not sufficiently supported to demonstrate a genuine dispute of material fact for trial that he was denied a raise or constructively

discharged as a result of unlawful political discrimination.  Therefore, Defendants' motion for summary judgment will be granted as to Walton's § 1983 claims.

VI.     CONCLUSION

For all of the reasons set forth herein, Defendants' Motion for Summary Judgment [57] is granted.  An appropriate Order follows.

*s/ Nora Barry Fischer*
Nora Barry Fischer
Senior United States District Judge

Dated: January 3, 2024

cc/ecf: All counsel of record.